MARGARET V. TULL,
Defendant Below, Appellant,

*vs.*

PAUL J. TUREK and DORIS B. TUREK, his wife,
Plaintiffs Below, Appellees.

*Supreme Court on Appeal—December 29, 1958.*

*Bruce M. Stargatt,* Wilmington, for appellant.

*Edmund D. Lyons,* Wilmington, for appellees.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

WOLCOTT, Justice: On October 7, 1948, the plaintiffs, husband and wife, entered into a written contract for the purchase from the defendant, Margaret V. Tull, of 1506 Broom Street, Wilmington, together with the business operated by her at that location known as "Tull Sanitarium". The plaintiffs agreed to pay the sum of $70,000. The assets purchased specifically included the tangible assets and the good will of the business known as "Tull Sanitarium". The plaintiffs were granted the exclusive right to use the name "Tull Sanitarium".

The contract of sale, in paragraph 6, provided as follows:

"6. The seller [defendant] agrees that she will not directly or indirectly, along or with others, in her name or in any other name engage in the business of operating and conducting a sanitarium or hospital in New Castle County and State of Delaware, for a period of ten years from the date hereof."

For a period of three years prior to the sale the defendant had operated a nursing or rest home on the premises under the name "Tull Sanitarium", and had established a favorable position in the community for her nursing home.

After the purchase the plaintiffs continued to operate the business of a nursing or rest home on the premises but, shortly thereafter, changed the name of the establishment to "Rest Haven". Since 1948 the plaintiffs have continued the furnishing of nursing care and treatment to ill and aged persons on these premises.

In the early part of 1956 plaintiffs learned that the defendant was carrying on a business at 5109 Governor Printz Boulevard under the name of "The Delawarean". Their suspicions were aroused that the defendant was operating a nursing or rest home in competition with their business. Upon the defendant's refusal to abandon her business enterprise, the plaintiffs instituted this action in the Court of Chan-

cery of New Castle County for an injunction against continued competition by the defendant and for damages.

After final hearing, the Vice-Chancellor entered a judgment denying injunctive relief, but directing the framing of an issue to be tried before a jury of the Superior Court to determine the amount of damages to which the plaintiffs were entitled.

From this judgment the defendant appeals urging that she has not competed with the plaintiffs, has not breached the restrictive covenant in the contract of sale and, accordingly, is not liable to the plaintiffs for damages.

■ The action is fundamentally a suit in the nature of specific performance to enforce a restrictive covenant prohibiting the operation of a competitive business by the defendant. The contract, and specifically paragraph 6 thereof, as a contract not to compete with the plaintiffs in business is one in partial restraint of trade. Such contracts, however, are enforceable in equity provided the imposed restraint is reasonable both as to its geographical extent and as to the burden it places upon the person who covenants not to compete by engaging in a particular form of business activity. 3 *Pomeroy's Equity Jurisprudence* (5th Ed.), § 934(b). The parties do not dispute this fundamental proposition.

The basic contention of the defendant is that she has not competed with the plaintiffs' business and thus has not violated the restrictive covenant. No point is made by her of the geographic extent of the covenant's scope. The plaintiffs, of course, maintain that defendant did compete in violation of the covenant.

The first point at issue is the meaning of the prohibition found in paragraph 6. In terms the defendant agreed not to "engage in the business of operating and conducting a sanitarium or hospital". Thus, argues defendant, since her business is admittedly neither a hospital nor a sanitarium, she has not breached her covenant. She refers to a number of definitions of the words "hospital" and "sanitarium" in order to demonstrate that the rest home or nursing home she is presently conducting does not fit either category. We will not labor the point except to say that we think it is the fact as demonstrated by the

evidence that the defendant is not operating the business of either a hospial or a sanitarium.

But, this does not dispose of the question. The covenant must be construed, if possible, to determine what was intended by the parties when it was included in the contract. This intent is to be determined in the light of the surrounding facts and circumstances. Such we conceive to be the rule laid down and followed by this Court in *Wright v. Scotton,* 13 *Del.Ch.* 402, 121 *A.* 69, 31 *A.L.R.* 1162.

This rule is an answer to a further argument made by defendant that an attempt to show the applicability of the restrictive covenant to a business other than one technically complying with the definition of "hospital" or "sanitarium" must be rejected as a violation of the parol evidence rule. Admittedly, the language of paragraph 6 is apparently unambiguous on its face, but such an apparent unambiguity may nevertheless require explanation in the light of the circumstances surrounding the agreement and the intention of the parties. This, in fact, is the manner in which the intended meaning of the restrictive covenant sued upon in *Wright v. Scotten, supra,* was determined.

We thus turn, as did the Vice-Chancellor, to an examination of the surrounding circumstances in the light of which the parties, in 1948, entered into the contract of sale. It is, of course, obvious that the inclusion in a contract of sale of a business of a covenant not to compete is included for the protection of the purchaser in his enjoyment of the business and its built-up good will. *Scotton v. Wright,* 13 *Del.Ch.* 214, 117 *A.* 131, affirmed 13 *Del.Ch.* 402, 121 *A.* 69. No other purpose could have been intended. That this, in fact, was intended in the contract before us is made abundantly clear from the contract's other terms.

The total purchase price agreed upon was $70,000, which was paid for the lands, buildings and equipment relating to the operation of the business of a nursing home, and for the business itself. Furthermore, specifically included in the sale was "the good will of 'Tull Sanitarium' ".

There was at the hearing before the Vice-Chancellor some dispute between the parties as to the value of the tangible physical assets

transferred to the plaintiffs. Accepting the defendant's valuation, however, the value of those tangibles was somewhere in the neighborhood of $35,000, thus leaving out of the total purchase price the sum of $35,000 which can only be a value placed upon the good will of the business transferred along with the physical assets. Since the plaintiffs thus were paying a substantial sum for the established good will, it admits of no doubt but that the covenant not to compete was intended to protect this good will from diminution by reason of competition from the defendant.

It lies outside the field of plausibility, therefore, to argue that plaintiffs and defendant intended the restrictive covenant to be enforceable only in the event the defendant entered into the business of conducting a hospital or sanitarium in view of the fact that the plaintiffs had not purchased any such business from the defendant. The business purchased was a nursing home operated by the defendant at the time of sale, and it is this business which paragraph 6 of the agreement was designed to protect.

The use of the words "sanitarium or hospital", therefore, must be explained, if an explanation is required, as an instance of careless draftsmanship in the preparation of the agreement of sale for which it would be unjust to make the plaintiffs suffer. Certainly, it should not operate to defeat the plain right of the plaintiffs not to be competed with by the defendant, which obviously was the intention of all parties to the contract of sale. Were it otherwise, the inclusion of paragraph 6 in the contract would have been a nullity for there is no demonstrated contemplation at the time of sale on the part of either the plaintiffs or defendant to enter the hospital or sanitarium business.

Much argument is made by the parties over the issue of whether the defendant has been in competition with the plaintiffs since 1955. We will not review in this opinion the evidence offered upon the issue. The Vice-Chancellor found as a fact that the defendant did compete. We have examined the evidence and are satisfied that the record supports the conclusion that the defendant has operated since 1955 a nursing home in New Castle County. It follows, therefore, that the defendant has been in competition with the plaintiffs since 1955 in violation of her covenant.

When the fact of competition is established, the rule of law is clear that, on the application of the injured purchaser of the business, equity will enjoin the continued breach of the restrictive covenant. Equity, almost as a matter of course, gives relief in such actions on the ground that the remedy at law is inadequate. *4 Pomeroy's Equity Jurisprudence* (5th Ed.), § 1344.

An exception to this principle, however, is that if an injured plaintiff, by his own tactics or by delay, has misled the one breaching the covenant into the breach, a Court of Equity may in its discretion refuse to give full relief to the injured party, but may leave him to such remedy as he has at law in a suit for breach of contract. *Richard Paul, Inc. v. Union Improvement Co.,* 33 *Del.Ch.* 113, 91 *A.2d* 49. This is not the situation in the case at bar, however, for the Vice-Chancellor specifically absolved the plaintiffs of any non-excusable delay in the enforcement of their rights, and absolved them of any conduct which misled the defendant into the false belief that the restrictive covenant would not be enforced against her. We accept these rulings since they are supported by the record.

We, accordingly, affirm the Vice-Chancellor's holdings that paragraph 6 of the contract of sale was intended to prohibit the defendant from engaging within the prescribed geographical area in the business of operating a nursing home, and that the defendant engaged in such a business in violation of the covenant. These findings entitled the plaintiffs to the equitable relief sought by their complaint, viz., an injunction against further breach of the covenant by the defendant. But the Vice-Chancellor refused to issue an injunction on the ground that the period of time remaining for the operation of the covenant was only a few more months, and that it would serve no useful purpose to enjoin the defendant from competing for the short remaining life of the covenant.

The correctness of the denial of injunctive relief has now become moot since the effective life of the covenant expired in October, 1958. We point out, however, that in the Richard Paul case we held that when a plaintiff's legal rights have been established and a clear breach of those rights has been established, the course of a

Court of Equity is clear. It has no option but to protect the plaintiff's
established legal rights by the award of injunctive process, except
in the rare case when the proof·establishes equities in favor of the
defendant arising from the inequitable conduct of the plaintiff. When
such countervailing equities exist, the ·Chancellor in his discretion may
refuse relief in the absence of a concession on the part of the plain-
tiff in recognition of the defendant's equities. No such considerations
being present in the case at bar, we think the plaintiffs were entitled
to have the defendant enjoined from further breach of her covenant.

■ A further argument made by the defendant against injunc-
tive relief is to the effect that this particular covenant is unenforceable
because it is unreasonable. Defendant cites *Restatement of Contracts*,
§§ 513, 514, and 5 *Williston on Contracts* (1937 Ed.), § 4581, stating
the rule that covenants in restraint of trade are unlawful if unreason-
able with respect to scope, the effect upon the promissor and the ef-
fect upon the public. The defendant argues that this particular cove-
nant is unreasonable because of its effect upon the public.

We think our foregoing remarks construing the covenant ef-
fectively dispose of this argument. Furthermore, defendant's argu-
ment upon this point seems to be not upon the alleged unreasonable-
ness of the covenant, but upon a contention that the plaintiffs' need
for protection of the good will of the business no longer existed. The
point now seems moot by reason of the passage of time. It need not
be reviewed by us.

■ Defendant next argues that that part of the judgment hold-
ing that the palintiffs are entitled to recover damages of the defendant
must be reversed by reason of the Vice-Chancellor's refusal to enjoin
the operation of the defendant. In effect, it is argued that the Chan-
cellor was without authority to refuse equitable relief and, at the
same time, retain jurisdiction of the cause for the purpose of award-
ing monetary damages. However, as we have pointed out, while the
refusal of the Vice-Chancellor to issue an injunction for the enforce-
ment of the covenant has now become moot, at the time of his judg-
ment it was error for him to have refused to do so. However, it still
would not follow, even if the circumstances at the time of judgment

were such as to make equitable relief inappropriate, that necessarily the complaint for damages should have been dismissed.

 Defendant's argument with respect to the lack of authority in the Court of Chancery, after denying equitable relief, to retain jurisdiction to award monetary damages is based upon 10 *Del.C.* § 342 which provides as follows:

"The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."

The quoted statute is merely declaratory of the ancient rule of equity that the basic jurisdictional fact upon which equity operates is the absence of an adequate remedy in the law courts. *Glanding v. Industrial Trust Co.,* 28 *Del.Ch.* 499, 45 *A.2d* 553; *Delaware Trust Co. v. McCune,* 32 *Del.Ch.* 113, 80 *A.2d* 507; *DuPont v. DuPont,* 32 *Del.Ch.* 413, 85 *A.2d* 724. As such, it is a limitation on the equitable jurisdiction of the Court of Chancery not by reason of the statute but by reason of an historic jurisdictional limitation imposed by equity jurisprudence generally. The statute, therefore, does not make the jurisdiction of the Court of Chancery of Delaware different from the jurisdiction of other Courts of Equity modeled upon the High Court of Chancery of Great Britain. An historic field of equity jurisdiction is that of suits for an injunction to restrain the breach of the covenant of a contract. Such jurisdiction is by analogy as broad as the jurisdiction of equity to compel the specific performance of a contract. 4 *Pomeroy's Equity Jurisprudence* (5th Ed.), § 1431.

It is thus apparent that at the time this complaint was filed, the Court of Chancery had jurisdiction to hear and determine the cause.

 A fundamental principle of equity is also that if equity has and takes jurisdiction of a cause, it will give relief in a manner to settle the controversy for all time, even though in so doing it must necessarily award relief not necessarily of purely equitable nature. Thus it is, that while a Court of Equity has no jurisdiction to entertain a suit brought purely for compensatory damages, those

being awarded at law, it may nevertheless award compensatory damages as a part of the final relief in a cause over which it admittedly had jurisdiction. 19 *Am.Jur., Equity,* § 126; 2 *Daniell's Chancery Pleading & Practice* (4th Ed.), 1081. This flows from the principle that equity will give full relief to avoid a multiplicity of suits. *Wright v. Scotton, supra.* Indeed, in Delaware, at least as early as 1834, the former High Court of Errors and Appeals recognized the authority of the Court of Chancery to award damages in an equitable action. *McDowell v. President, etc., Bank of Wilmington and Brandywine,* 1 *Har.* 369.

Defendant argues that if the Chancellor refuses in his discretion to give any form of purely equitable relief, he is powerless to do anything more with the action but to dismiss the complaint and leave the parties to their remedy at law. The argument is fundamentally opposed to the generally accepted principle of equity jurisprudence that once equity has acquired jurisdiction of a cause, it will retain that jurisdiction to give final relief to end the controversy. This remains the rule even though circumstances have arisen after the filing of the complaint which make the equitable relief prayed for impracticable. 1 *Pomeroy's Equity Jurisprudence* (5th Ed.), § 237(e).

This is the precise situation now before us. The Vice-Chancellor expressly found that the defendant had no defense to the plaintiffs' cause but that the passage of time after the filing of suit, in his opinion, made the award of equitable relief inappropriate. We note that further passage of time since the judgment was entered has made the granting of purely equitable relief not only inappropriate but improper. Nevertheless, despite his finding, the Vice-Chancellor retained jurisdiction to compensate the plaintiffs for the damages sustained by the defendant's breach of the contract. We think he was correct in so doing.

Defendant complains that in the course of the hearing, the Chancellor admitted into evidence a document known as Plaintiffs' Exhibit No. 2. The exhibit in question was admitted pursuant to 10 *Del.C.* § 4310(a), providing that business records shall be competent

evidence in trials if a qualified witness testifies as to its identity and method of preparation. Plaintiffs' Exhibit No. 2 was prepared by the plaintiffs' accountant from data supplied him from time to time by one of the plaintiffs. The entries made in a ledger were made once a year from an analysis of plaintiffs' income expenses and other figures relating to the operation of plaintiffs' business. We think the entries on Plaintiffs' Exhibit No. 2 were made from year to year in the regular course of the plaintiffs' business. This being so, the document meets the test of admissibility of 10 *Del.C.* § 4310(a). We, of course, express no opinion upon the probative quality of the exhibit.

Next, the defendant complains that the Vice-Chancellor failed to visit the establishments of the plaintiffs and the defendant as he stated at the close of the taking of testimony he would. Defendant argues that the omission prejudiced her because, otherwise, she would have called further witnesses as part of her case. However, we note that after the Vice-Chancellor handed down his opinion, and after it had become apparent that he was not going to visit the respective premises, no application was made to him by the defendant.

In any event, the application to the Vice-Chancellor to view the premises was addressed to his discretion. He could accede to or reject the suggestion as he saw fit, provided that he did not thereby prejudice the rights of either side. No prejudice to the defendant's case has been shown. Indeed, the Vice-Chancellor may have concluded after deliberating over the evidence offered that nothing further would be gained by a personal inspection. Having read the testimony in full, we think such a conclusion justified. There is no error in his failure to personally inspect the respective places of business.

Finally, defendant argues that the Vice-Chancellor committed error in ordering the framing of an issue of *quantum damnificatus* for a jury of the Superior Court to determine the amount of compensatory damages to be recovered by the plaintiffs from the defendant. The argument is that having fully heard the parties on the issue of damages, the Vice-Chancellor should have decided the issue himself and not referred it to a jury of the Superior Court.

We have examined the full transcript of the testimony and are of the opinion that to characterize the testimony on this issue as a full trial on the issue is an exaggeration. The testimony, however, demonstrates that the damages are unliquidated, and range from a nominal sum to as high as $35,000. They are, therefore, precisely similar to the damages in the Scotton case as to which the Chancellor (13 *Del.Ch.* at page 233, 117 *A.* at page 140) said: "They are typically unliquidated in character. Being such they fall peculiarly within the province of a jury to ascertain." In view of this circumstance, the Chancellor ordered that an injunction issue, and that the question of the amount of damages be referred to a jury of the Superior Court.

The practice of the referral of issues of fact to a jury for trial is one of long standing in Courts of Equity. It is a discretionary power of the Chancellor, which he may exercise or not as, in his opinion, the exigencies of the case require. 2 *Daniell's Chancery Pleading and Practice* (4th Ed.), 1080; *Story, Equity Jurisprudence* (14th Ed.), § 1084; *Scotton v. Wright, supra.*

Since, therefore, the power of the Chancellor to frame an issue of *quantum damnificatus* is clear, and since it is one to be exercised within his discretion, it is plain that his decision to do so is reviewable in this Court only for an abuse of that discretion. We think the issue of damages in the case at bar is not dissimilar to that issue in the Scotton case. An examination of the record of that case demonstrates that evidence as to the amount of damages was also received. Still the issue was submitted to a jury. The case is a plain precedent for the referral in the case at bar. Under the circumstances we find no abuse by the Vice-Chancellor of his discretion.

The judgment below is affirmed.