# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WEIL HOLDINGS II, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0388-BWD |
| | ) | |
| JEFFERY ALEXANDER, DPM, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION RESOLVING CROSS-MOTIONS FOR SUMMARY JUDGMENT

Date Submitted: February 10, 2025
Date Decided: March 4, 2025

Jamie L. Brown, Elena M. Sassaman, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; OF COUNSEL: Jonathan S. Goodman, Alec J. Losh, Elizabeth L. Archerd, PATZIK, FRANK & SAMOTNY LTD., Chicago, IL, *Attorneys for Plaintiff Weil Holdings II, LLC.*

Travis J. Ferguson, McCARTER & ENGLISH, LLP, Wilmington, DE, *Attorneys for Defendant Jeffery Alexander, DPM.*

**DAVID, V.C.**

In this action, the plaintiff, a holding company, seeks to enforce a noncompetition provision contained in a limited liability company agreement against a podiatrist who was previously employed by a contractual counterparty of its affiliate. The noncompete is indefinite in duration and would restrict the podiatrist from practicing in a geographic region that is constantly subject to change. On cross-motions for summary judgment, this memorandum opinion concludes that the noncompete is unreasonable on its face and declines to blue pencil the parties' agreement. Judgment is entered for the defendant.

## I. BACKGROUND

### A. Defendant, A Podiatrist, Executes An LLC Agreement With A Noncompete.

Weil Holdings II, LLC ("Weil Holdings" or "Plaintiff") is a Delaware limited liability company that owns PNC Podiatry Holdings, LLC ("Balance Holdco"), which, in turn, owns Weil Foot & Ankle Management, LLC ("Weil Management"). Verified Compl. for Injunctive Relief [hereinafter Compl.] ¶¶ 9, 13, 21, Dkt. 1; Transmittal Aff. of Travis J. Ferguson in Supp. of Def.'s Opening Br. in Supp. of His Mot. for Summ. J. [hereinafter Ferguson Aff.], Ex. A at Interrog. Resp. No. 2, Dkt. 37.

Weil Management provides non-professional management, administrative, advisory, and back-office services to Weil Foot and Ankle Institute, LLC ("WFAI"), a podiatric practice with sixteen offices in Illinois and one office in Kenosha,

Wisconsin (the "Kenosha Office"). Compl. ¶¶ 13, 16; Ferguson Aff., Ex. A at Interrog. Resp. No. 18. Weil Management also provides similar services to Foot and Ankle Specialists of West Michigan, PLLC ("FASWM") and 1 Foot 2 Foot Centre for Foot and Ankle Care, P.C. ("1F2F"), podiatric practices that operate in Michigan and Virginia, respectively. Compl. ¶ 16; Ferguson Aff., Ex. A at Interrog. Resp. Nos. 10, 18.

Dr. Jeffery Alexander ("Defendant") is a podiatric foot and ankle surgery specialist who worked for WFAI from July 2014 through August 2023. Aff. of Jeffery Alexander [hereinafter Alexander Aff.] ¶¶ 4, 8–9, Dkt. 37. While employed by WFAI, Defendant primarily treated patients at WFAI's Oak Park and Glenview, Illinois offices (the "Oak Park Office" and "Glenview Office," respectively) and never worked in the Kenosha Office. *Id.* ¶ 10.

In May 2023, Balance Holdco purchased membership interests in Weil Management. Compl. ¶ 21. As part of that transaction, Defendant made a capital contribution to Weil Holdings, acquiring a 7.7% membership interest in that entity, which he believes is worth approximately $2.8 million. *Id.* ¶ 23; Alexander Aff. ¶ 16.

At that time, Defendant executed the Limited Liability Company Agreement of Weil Holdings II, LLC (the "LLC Agreement"), which is governed by Delaware law. Compl. ¶¶ 21, 24, 39; Alexander Aff. ¶ 18. Section 2.6 of the LLC Agreement

2

includes provisions governing the "Non-Competition and Non-Solicitation of Employee Unitholders." Ferguson Aff., Ex. B [hereinafter LLC Agt.] § 2.6. Section 2.6(a) states:

> For so long as any Unitholder holds, directly or indirectly, any Units and for a period of two (2) years thereafter (the "Restricted Period"), such Unitholder shall not, and such Unitholder (if an entity) shall cause its legal and beneficial owners not to, directly or indirectly,
>
> > (i) engage in, or assist others in engaging, in the Restricted Business within the Restricted Territory,
> >
> > (ii) have an interest in any Person that engages in the Restricted Business anywhere in the Restricted Territory in any capacity whatsoever, including as a partner, member, stockholder, manager, director, officer, employee, consultant, principal, agent or trustee . . . , or
> >
> > (iii) cause, induce or encourage any actual or prospective patient, client, customer, supplier, vendor, referral source, business partner, service provider, consultant, lender, investor, landlord, agent, independent contractor, licensor or licensee of the business of any of the Company, the Company Entities, the Affiliated Practices, PNC Management, PNC Managed Practices, and their respective Affiliates (collectively and individually, the "Company Group"), or any other Person who has a business relationship with the business of any member of the Company Group, or to terminate or modify any such Person's relationship with the business of any member of the Company Group in a manner that is adverse to any member of the Company Group;
>
> provided, however, that nothing herein shall prevent (A) Lowell S. Weil, Jr. and Matthew C. Dairman, DPM from owning, managing, providing services through, or otherwise participating in the business and activities of Foot and Ankle Business Innovations, LLC, as they are currently conducted; (B) services rendered in carrying out employment duties to any member of the Company Group; (C) consulting to medical

device, pharmaceutical or health information technology companies; (D) clinical research activities; (E) continuing to own any interest in any surgery center which such Unitholder owned (or under a letter of intent to be acquired) as of the date such Unitholder (or such Unitholder's respective Affiliate) became a Unitholder and provision of medical director services by such Unitholder to such surgery center; and (F) providing residency program director services; provided, however, that except as otherwise approved by Balance Holdco in writing, that in the case of subsections (C)–(F) such Person shall have first received written approval from an authorized representative of Balance Holdco to engage in such activity (with such approval not to be unreasonably delayed or withheld).

*Id.* § 2.6(a) (formatting altered for clarity). This memorandum opinion refers to Section 2.6(a)(i) as the "Noncompete"; Section 2.6(a)(ii) as the "Ownership Restriction"; and Section 2.6(a)(iii) as the "Non-Solicitation Provision."

The LLC Agreement defines "Affiliated Practice," "Restricted Business," "Restricted Territory," and "Primary Practice Site" as follows:

"Affiliated Practice" means (i) any entity that provides podiatry or other healthcare services that has entered into a management or administrative services agreement with Weil Management, which podiatric entities include, without limitation, Weil Foot and Ankle Institute, LLC, an Illinois limited liability company, Foot & Ankle Specialists of West Michigan, PLLC, a Michigan professional limited liability company and 1 Foot 2 Foot Centre for Foot and Ankle Care, P.C., a Virginia professional service corporation, and (ii) Infinity Vascular Institute, S.C., an Illinois medical corporation.

"Restricted Business" means the business of one or more of the following: providing podiatric services, providing orthopedic services, providing wound care services, and providing and arranging non-clinical management, administrative, advisory, and back-office services to healthcare providers who provide podiatric services, orthopedic services, and/or wound care services.

4

"Restricted Territory" means (a) with respect to the practice of podiatric medicine or any other medicine by . . . Jeffery Alexander, DPM . . . a radius of 25 miles from [Defendant's] Primary Practice Site, and 15 miles from any other practice site of the Affiliated Practices.

"Primary Practice Site" means, with respect to a Member who is a podiatrist, any site where, in the aggregate, at least 20% of such Member's office time has been spent practicing podiatry or otherwise performing podiatric services to patients, or if such Member's practice schedule is such that such Member is not in any site where, in the aggregate, at least (20%) of such Member's office time has been spent practicing podiatry or otherwise performing podiatric services to patients, then the two (2) sites where such Member spends the most office time.

*Id.*, App'x A.

The LLC Agreement does not provide for a mandatory repurchase or redemption of a member's interests for any reason. *See id.* §§ 2.4, 8. Signatories to the LLC Agreement "acknowledge[] that the restrictions contained in . . . Section 2.6 are reasonable and necessary to protect the legitimate interests of the Company Group,"[1] and represent that "[s]uch Member is an 'accredited investor'" with "knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto." *Id.* § 2.5(b), (d), (f).

---

[1] The LLC Agreement defines "Company Group" to include "the Company, the Company Entities, the Affiliated Practices, PNC Management, PNC Managed Practices, and their respective Affiliates." LLC Agt. § 2.6(a).

5

**B.    Defendant Is Terminated And Finds Employment Elsewhere, But Weil Holdings Sues To Enforce The Noncompete.**

WFAI terminated Defendant's employment on August 17, 2023.  Compl. ¶ 40; Alexander Aff. ¶ 9.

In February 2024, Defendant began practicing podiatry for Lakeview Health, LLC ("Lakeview") in Racine, Wisconsin (the "Racine Office").[2]  Alexander Aff. ¶¶ 19–20.  The Racine Office is approximately 60 miles from the Oak Park Office and 46 miles from the Glenview Office (where Defendant formerly practiced), but within 15 miles of the Kenosha Office (where Defendant has never practiced).  *Id.* ¶¶ 10, 11, 20, 21.

On April 12, 2024, Plaintiff initiated this action through the filing of a Verified Complaint for Injunctive and Other Relief (the "Complaint").  The Complaint alleges claims for breach of Section 2.6 of the LLC Agreement ("Count I") and tortious interference with business expectancy ("Count II"), and seeks injunctive relief specifically enforcing the Noncompete and an award of damages.  Concurrent with the filing of the Complaint, Plaintiff moved for expedition in advance of a forthcoming motion for preliminary injunction.  Dkt. 2.  On June 28, however,

---

[2] Defendant became licensed to practice podiatric medicine in Wisconsin in February 2024, after he was terminated by WFAI.  Alexander Aff. ¶¶ 7, 9.

Plaintiff filed a letter explaining that Lakeview had terminated Defendant's employment, such that expedition was no longer necessary. Dkt 31.

Defendant then began practicing podiatry with Northern Illinois Foot & Ankle Specialists, at a location that appears to be outside of the "Restricted Territory" subject to the Noncompete. Aff. of Lowell S. Weil, Jr., DPM in Supp. of Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Cross-Mot. for Summ. J. [hereinafter Weil Aff.] ¶ 10, Dkt. 46.

The parties have cross-moved for summary judgment (the "Motions"). Dkts. 37, 44.[3] The Court heard oral argument on February 10, 2025. Dkt. 59.

## II. ANALYSIS

The Court will enter summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). "When the Court is faced with cross-motions for summary judgment[,] the same standard must be applied to each of the parties' motions and the mere existence of cross-motions does not necessarily indicate that summary

---

[3] On August 2, 2024, Defendant filed his Opening Brief in Support of his Motion for Summary Judgment. Dkt. 37 [hereinafter DOB]. On September 17, Plaintiff filed its Answering Brief and Opening Brief in Support of its Cross-Motion for Summary Judgment. Dkt. 45 [hereinafter PAB]. On October 1, Defendant filed his Reply Brief in Further Support of His Motion for Summary Judgment and in Opposition of Plaintiff's Cross-Motion for Partial Summary Judgment. Dkt. 51 [hereinafter DRB]. On October 15, Plaintiff filed its Reply Brief in Further Support of Its Cross-Motion for Summary Judgment. Dkt. No. 55 [hereinafter PRB].

judgment is appropriate for one of the parties." *Baring v. Condrell*, 2004 WL 2340047, at *3 (Del. Ch. Oct. 18, 2004). "Thus[,] when presented with cross-motions for summary judgment[,] a movant will be granted relief only if the Court determines that the record does not require a more thorough development to clarify the law or its application to the case." *Id.*

The parties have cross-moved for summary judgment on the enforceability of the Noncompete as a matter of law. Defendant contends that the Noncompete is unenforceable because, among other reasons, it is unreasonable in duration and geographic scope, it is "incongruous" with Defendant's relationship to Weil Holdings, and it is not tailored to Weil Holdings' legitimate economic interests. The analysis below focuses on the argument that the Noncompete is facially unenforceable due to its unreasonable duration and geographic scope—an argument that, I find, carries the day.

### A.    The Standard

"While Delaware is a contractarian state, 'Delaware courts do not "mechanically" enforce non-competes.'" *Hub Gp., Inc. v. Knoll*, 2024 WL 3453863, at *7 (Del. Ch. July 18, 2024) (quoting *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020)). Instead, Delaware courts "closely scrutinize[] [noncompetes] as restrictive of trade." *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977). A noncompete is enforceable only when it

"(1) is reasonable in geographic scope and temporal duration, (2) advance[s] a legitimate economic interest of the party seeking its enforcement, and (3) survive[s] a balancing of the equities." *FP UC Hldgs., LLC*, 2020 WL 1492783, at *6 (alteration in original) (quoting *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018)).

This Court often considers "cases where an employee, in consideration of future employment, is compelled to enter a contract not to compete." *Hub Gp., Inc.*, 2024 WL 3453863, at *1. In those cases, the Court must carefully balance the value in "holding contracting parties to their promises and enforcing their reasonable expectations" against "the encouragement of competition and discouragement of restraints on trade, the recognition of an individual's right to choose her employment, and the desire to avoid oppressive or unclear obligations arising from contracts of adhesion." *Id.* By comparison, "[g]enerally, covenants not to compete in the context of a business sale are subject to a 'less searching' inquiry than if the covenant 'had been contained in an employment contract.'" *Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 5240507, at *4 (Del. Ch. Oct. 6, 2022) (quoting *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004)). That is because "[a] sale of a business typically does not involve disparate bargaining power." *Labyrinth, Inc. v. Urich*, 2024 WL 295996, at *24 (Del. Ch. Jan. 26, 2024).

Plaintiff contends that, because the Noncompete is included in an LLC agreement rather than an employment agreement, "a more deferential standard of review applies." PAB at 25. Defendant agreed to the Noncompete as part of a private equity investment, representing in the LLC Agreement that he was "an 'accredited investor'" with "knowledge and experience in financial and business matters." LLC Agt. § 2.5(b), (d). In response, Defendant points out that he did not agree to the Noncompete as part of a sale of a business, but instead was investing in an affiliate of his employer, nor did he negotiate the terms of the LLC Agreement. DRB at 3; Weil Aff. ¶ 5; Alexander Aff. ¶ 18. As a result, Defendant argues, the Court should undertake a "more searching" review.

Implicit in the analysis below, I have taken into account that, although Defendant did not agree to the Noncompete as part of a sale of a business, he did willingly agree to it as part of an investment in which he held himself out as a sophisticated party, as opposed to simply accepting it as a precondition of employment. I note that the parties have raised issues of fact concerning the degree to which Defendant could have negotiated the terms of the LLC Agreement.[4]

---

[4] Plaintiff contends that other investors negotiated the terms of the LLC Agreement, and Defendant had an opportunity to do so as well. Weil Aff. ¶ 5. Plaintiff submits that other podiatrist-investors "participated in the negotiation of the [LLC] Agreement" and one "raised questions about the [LLC] Agreement's provisions." *Id.* Plaintiff also submits that

Ultimately, that factual dispute is immaterial and does not preclude entry of summary judgment. That is because neither party has shown that a "more" or "less" searching inquiry here would change the outcome, and I find that it does not.[5] Taking into account Plaintiff's position that greater deference is warranted under these facts, the duration and geographic scope of the Noncompete are nevertheless unreasonable. It is not a close call.

**B.     The Unreasonable Duration And Geographic Scope Of The Noncompete Render It Unenforceable.**

The Noncompete is unenforceable because its duration and geographic scope are unreasonable.

The duration of the Noncompete is overly broad. The LLC Agreement purports to bind Defendant to the Noncompete "[f]or so long as [Defendant] holds" his membership units and "for a period of two (2) years thereafter." LLC Agt. § 2.6(a). Because the LLC Agreement does not afford members a mandatory

---

Weil Management's counsel "reported updating provisions in the [LLC] Agreement, which notably included reducing the scope of the physicians' non-compete obligations." *Id.* (emphasis removed). According to Plaintiff, "[p]hysicians were regularly updated on the evolving transaction documents, were provided redlines when the [LLC] Agreement's terms changed, and were permitted to offer input or meet with counsel." *Id.* This dispute of fact is immaterial, as the outcome of my analysis would not change even if the opportunity for negotiation existed, as Plaintiff contends.

[5] *See Cleveland Integrity Servs., LLC v. Byers*, 2025 WL 658369, at *10 n.129 (Del. Ch. Feb. 28, 2025) ("[A]s I find the Noncompete is unenforceable even under the less searching sale-of-a-business inquiry, I do not hold that standard is not applicable here.").

redemption right, the Noncompete is "potentially indefinite." *See Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 756 (Del. Ch. 2023) (finding a "potentially indefinite" noncompete was unreasonable where a member could not "divest himself of the units and start the clock" on the noncompete).

Plaintiff points out that the LLC Agreement permits (but does not obligate) Weil Holdings to repurchase membership units. PAB at 37; Ferguson Aff., Ex. A at Interrog. Resp. No. 6; Aff. of Jamie L. Brown in Supp. of Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. & in Supp. of Pl.'s Cross-Mot. for Summ. J. as to Liability, Ex. 8, Dkt. 47; Weil Aff. ¶¶ 8–9. But that means Plaintiff decides when—and if—to accept an offer, putting the duration of the Noncompete entirely within Plaintiff's control. *See Sunder Energy, LLC*, 305 A.3d at 756 (finding the duration of a noncompete unreasonable where a "call option g[a]ve[] [individuals at the company] sole discretion over when the two-year clock starts").

Plaintiff also suggests that, because Balance Holdco is a private equity investment, which typically "last[s] anywhere from three to ten years," the Court may infer that the Noncompete will not apply indefinitely. PAB at 34–36. Importantly, the LLC Agreement does not include any such time limitation. But even if it were appropriate to look to evidence outside the contract, and even if it were reasonable to infer that Balance Holdco would likely wind up within ten years, a twelve-year Noncompete is not reasonable under the circumstances. *See*

12

*Labyrinth, Inc.*, 2024 WL 295996, at \*23 (determining that a ten-year noncompete was unreasonable, explaining that "[o]nly one Delaware case has found a ten-year restrictive covenant reasonable, but it [wa]s coupled with a tightly circumscribed geographic scope" (citing *Tull v. Turek*, 38 Del. Ch. 182, 192–93 (Del. 1958))).

The Noncompete is also overbroad in geographic scope. Under the LLC Agreement, the "Restricted Territory" includes "a radius of 25 miles from [Defendant's] Primary Practice Site, *and 15 miles from any other practice site of the Affiliated Practices*." LLC Agt., App'x A (emphasis added). An "Affiliated Practice" is "any entity that provides podiatry or other healthcare services that has entered into a management or administrative services agreement with Weil Management." *Id.*

Weil Management is currently party to contracts with WFAI, FASWM, and 1F2F, which provide podiatry services in Illinois, Wisconsin, Michigan, and Virginia. Even assuming Weil Holdings has a legitimate business interest in "protect[ing] WFAI's patient relationships and local referral sources" by "encourag[ing] its recurring patients to stay with WFAI's physicians if their doctor departs,"[6] PAB at 30, a Noncompete that prevents Defendant from practicing

---

[6] Defendant contends that, because Weil Holdings "does not treat patients or provide podiatric medical services and WFAI is not an operating subsidiary of Weil Holdings," it

podiatric medicine in areas within four states—including two where Defendant has never served patients—is not appropriately tailored to protect that interest.

Far more concerning, however, is that under the Noncompete, the Restricted Territory can change dramatically as Affiliated Practices move and expand. Each time Weil Management contracts with a new entity—and as those Affiliated Practices move their offices or acquire new practices—the geographic scope of the Noncompete may enlarge. Plaintiff makes much of the fact that Defendant found new employment outside of the Restricted Territory, but if Weil Management signs a new contract—or if WFAI, FASWM, or 1F2F moves an existing office or opens a new one—Defendant may suddenly find himself in breach of the Noncompete. Those concerns are not, as Plaintiff suggests, "academic" or "speculative." PAB at 32; *see, e.g.*, *Hub Gp., Inc.*, 2024 WL 3453863, at *8 (finding a noncompete unenforceable where the zip codes included in the restricted territory were "subject to change on a day-to-day basis"). For a person seeking stable housing and employment, they are unworkable.

Taken together, the duration and geographic scope of the Noncompete could indefinitely restrict Defendant from practicing podiatric medicine in a geographic

---

has *no* legitimate interest in restricting Defendant from competing with WFAI. DRB at 14; DOB at 21–23. Because the Noncompete is unenforceable for other reasons, the Court does not need to resolve that argument.

region that is constantly subject to change. The Noncompete is facially unenforceable due to its unreasonable duration and geographic scope.

## C. The Court Will Not Blue Pencil The Noncompete.

The Delaware Supreme Court recently confirmed in *Sunder Energy, LLC v. Jackson* that "Delaware courts have the discretionary power to blue pencil overbroad restrictive covenants to align a company's legitimate interests and an individual's right to be free from unreasonable restrictions on their livelihood." 2024 WL 5052887, at *8 (Del. Dec. 10, 2024). "[T]he court's decision to exercise that equitable power should be based on the covenants themselves and the circumstances surrounding their adoption . . . ." *Id.* at *12. For example, "Delaware courts have exercised their discretion to blue pencil restrictive covenants under circumstances that indicate an equality of bargaining power between the parties, such as where the language of the covenants was specifically negotiated, valuable consideration was exchanged for the restriction, or in the context of the sale of a business." *Id.* at *8.

*Sunder* "did not carry any of those hallmarks"—"the parties did not negotiate the Covenants in any substantive way" or evince equal bargaining power, the defendant "received minimal-to-no separate compensation in exchange for his agreement to be bound by the Covenants," and "no apparent effort was made to tailor

15

the provisions to [the plaintiff's] legitimate interests."[7]  *Id.* at *8–11.  Under those facts, the Supreme Court concluded that "the Court of Chancery was well within its discretion to apply that precedent and refuse to blue pencil the Covenants."  *Id.* at *10.

Here, too, the undisputed facts "d[o] not carry any of th[e] hallmarks" of equal bargaining power which might support blue penciling the parties' agreement.  *Id.* at *8.  It is undisputed, for example, that the Noncompete was not negotiated in the context of a sale of a business,[8] the parties did not negotiate the Noncompete in any substantive way,[9] and, even accepting Plaintiff's position that Defendant was a sophisticated investor with an opportunity to negotiate the Noncompete,[10] his position as a unitholder employee placed him in a disparate bargaining position.

---

[7] Although the Supreme Court's affirmance was based on a developed record after trial, I do not read *Sunder* to require a trial on the availability of blue penciling where, as here, a noncompete is facially invalid and the undisputed facts do not support such a remedy.

[8] Of course, the Court may exercise its discretion to decline to blue pencil a restrictive covenant even where it was negotiated in connection with the sale of a business.  *See, e.g.*, *Cleveland Integrity Servs., LLC.*, 2025 WL 658369, at *12 (declining to blue pencil a noncompete negotiated in the context of a sale of a business).

[9] *Sunder Energy, LLC*, 2024 WL 5052887, at *10; Weil Aff. ¶ 5 ("Dr. Alexander . . . did not attempt to negotiate any terms of the [LLC] Agreement."); Alexander Aff. ¶ 18 ("Notwithstanding my execution of the LLC Agreement, I had no involvement with negotiating the terms of the LLC Agreement.").

[10] *See supra*, pp. 8–10.

Moreover, Plaintiff's request for blue penciling is particularly inapt here because doing so "would require the court to craft an entirely new covenant to which neither side agreed." *Id.* at *12. To solve the indefinite duration of the Noncompete, the Court would have to arbitrarily select a finite duration. And to address the geographic scope, it would have to choose between redefining Affiliated Practices to refer only to those practices where Defendant worked; freezing the definition of Affiliated Practices in time so that it is not subject to change; excising the reference in Section 2.6 that refers to Affiliated Practices altogether; or making some other manner of edits to rein in the overbroad language. It may be possible to do so, but it would also create "a perverse incentive towards over-breadth or lack of clarity." *Hub Gp., Inc.*, 2024 WL 3453863, at *1.

Taking into account the undisputed facts concerning the Noncompete's adoption and the difficulty of redrafting a new covenant to which neither party agreed, the Court declines to exercise its discretionary power to blue pencil the Noncompete.

### D. Any Dispute Over The Ownership Restriction And Non-Solicitation Provision Is Not Ripe For Adjudication.

In briefing, Defendant argues that the Ownership Restriction and Non-Solicitation Provision are also unenforceable. At oral argument, however, Plaintiff confirmed that it does not allege claims for breach of those provisions. Draft Tr.

17

47:5–12.[11]  With that clarification, the Court will not issue an advisory opinion on the enforceability of those provisions.  *See Monsanto Co. v. Aetna Cas. & Sur. Co.*, 565 A.2d 268, 275 (Del. Super. 1989) ("[T]he Court must be sure that it does not construct hypothetical factual situations on which it makes a finding, putting forth an advisory opinion.  The matter would clearly not be ripe for adjudication in that situation." (citation omitted)).

### E.    Judgment On Count II Is Entered For Defendant.

Count II of the Complaint alleges that Defendant tortiously interfered with Plaintiff's business expectancy by breaching the Noncompete. Compl. ¶¶ 76–86; PAB at 43.  Because Count II is predicated on an unenforceable Noncompete, judgment on that count is entered in Defendant's favor.

## III.    CONCLUSION

For the reasons explained above, Defendant's Motion for Summary Judgment is GRANTED, and Plaintiff's Motion for Summary Judgment is DENIED. Judgment is entered for Defendant.

---

[11] The Feb. 10, 2025 transcript has not been finalized.  "Draft Tr." refers to a draft transcript of the Feb. 10, 2025 oral argument.